(17 Misc. Rep. 172)

CARPENTER v. NEGUS et al.

(Supreme Court, Special Term, New York County. May, 1896.)

INSURANCE—PAYMENT OF LOSS—CHANGE OF BENEFICIARY.

> A policy on the life of a husband, payable to his wife, or, in case of her death before his, to her children, provided that a paid-up policy might be taken at any time after two annual premiums had been paid. After the death of the wife the husband surrendered the policy, and took a paid-up policy, payable to the deceased wife, if living, "and, if not living, to the children of said person whose life is hereby insured," after which the husband married again, and had children by his second wife. *Held,* that the children of the second wife were not entitled to any portion of the insurance money, where the children of the first wife did not consent to the change in the designation of the beneficiary, or ratify it after it was made.

Action by William B. C. Carpenter, as administrator, against Emma L. Negus and others, on a policy of insurance issued on the life of William I. Negus. Defendant insurance company was discharged from the action on paying the amount of the policy into court, and the action proceeded for the determination of the claim of plaintiff that the children of the insured by his first wife were entitled to the insurance money to the exclusion of his second wife and his children by her, who were substituted as defendants in the place of the insurance company. Judgment for plaintiff.

Benjamin N. Cardozo, for plaintiff.
Charles S. Simpkins, for guardian ad litem of infant defendants.
Frederic G. Smedley, for defendant Wm. V. Negus.

BEEKMAN, J. On the 8th day of January, 1864, the New York Life Insurance Company issued a policy of insurance, which recited that, in consideration of the representations made in the application for the policy and of the sum of $541.60 paid by Maria E., wife of William I. Negus, and of the annual premium for nine years of

$541.60, to be paid annually on or before the 30th day of December in the years 1864, 1865, 1866, 1867, 1868, 1869, 1870, 1871, and 1872, and of the interest annually on all of the premium notes on the policy on or before the 30th day of December of each year until the said notes were paid, the said company assured the life of the said William I. Negus in the amount of $10,000 for the term of his natural life, commencing on the 30th day of December, 1863, at noon. The company agreed to pay the amount of the insurance to the beneficiary, Maria E. Negus, or her legal representatives, within 60 days after notice and proof of interest and of the death of the said William I. Negus; and, in case of the death of said Maria E. Negus before the decease of the said William I. Negus, that the amount of said insurance should be payable after her death to her children for their use, or to their guardian if under age, within 60 days after notice and proof of the death of the insured, deducting therefrom all notes for premiums on the policy unpaid at that time, together with any balance of the year's premium remaining unpaid. Maria E. Negus, the wife of the insured, died on the 16th day of November, 1866, leaving, her surviving, the following children: Loretta Negus Carpenter, Emma Lavinia Nonus, Jane E. Carpenter, Maria L. Smith, and William Vincent Negus, all of whom are now deceased except Mrs. Loretta N. Carpenter and William V. Negus. The policy in question contained this clause:

"It being understood and agreed that if, after the receipt by this company of not less than two or more annual premiums, this policy should cease in consequence of the nonpayment of premiums, then, upon a surrender of the same, the company will issue a new policy for the full value acquired under the old one, subject to any notes that may have been received on account of premiums; that is to say: If payments for two years have been made, it may issue a policy for two-tenths of the sum originally insured; if for three years, for three-tenths; and in the same proportion for any number of payments, without subjecting the assured to any subsequent charge except the interest annually on all premium notes remaining unpaid on this policy."

On the 15th day of February, 1873, advantage was taken of this stipulation, the above policy was surrendered and canceled, and in place thereof a paid-up policy was issued, which in terms recites the consideration to be the statements and representations made to the company, and "the value acquired under policy No. 24,465," which was the number of the policy first issued, and insured the life of William I. Negus in the amount of $9,000 for the term of his natural life, commencing on the 30th day of December, 1872, the amount being the exact surrender value of the original policy according to its terms. By the policy last issued the company promised to pay the amount of the said insurance "to the assured under this policy, to wit, Maria E., wife of said William I. Negus, for her sole use if living, in conformity with the statute, and, if not living, to the children of said person whose life is hereby assured, or their guardians for their use, or, if there be no such children surviving, then to the executors, administrators, or assigns of said person whose life is hereby assured, in sixty days after due notice and satisfactory proof of the death during the continuance of this policy of the said person whose life is hereby assured as above, deducting therefrom all indebtedness

to the company." Subsequent to the issuing of this policy, and in the year 1874, William I. Negus was married to the defendant Emma L. Negus, by whom he had four children, of whom Ethel D. Negus, Grace T. Negus, and Lucy S. Negus were living at the time of his decease, which took place on the 3d day of January, 1895. Upon his decease a claim was made on behalf of the children of Maria E. Negus, and the representatives of such of them as were then deceased, against the company, that they only should be paid the amount of the insurance, on the ground that they had acquired a vested interest in the insurance under the terms of the original policy, and that its surrender and the delivery in its place of the paid-up policy, which changed the beneficiaries from the children of Maria E. Negus to the children of William I. Negus, in the manner and upon the contingencies which are specified in the paid-up policy, was without either their knowledge or consent, and was, therefore, without warrant of law. The company having refused to recognize this claim, this action was accordingly commenced by the administrator of one of the children of the first marriage against it and against the other children and representatives of deceased children of such marriage who had refused to become plaintiffs in the action. Thereafter a motion was made by the insurance company for an order discharging it from the action upon the payment into court of the amount of the insurance, and the substitution in its place of the widow, the defendant Emma L. Negus, and the children of the second marriage, the defendants Ethel D., Grace T., and Lucy S. Negus. Upon this motion an order was made granting the relief asked for, and the litigation is now solely between the children of the first and second marriages.

The law is well settled that, where a policy such as was first issued by the company is made, the persons for whose benefit the insurance is taken out are the parties with whom the contract is made, and that they have a vested interest therein, of which they cannot be deprived without their consent. The insured is considered to be the agent of such parties in taking out the policy and in the performance of such acts as are consistent with its terms, and which should be performed in support and promotion of their interests. Such agency, however, it has been expressly held, does not extend to any act in hostility to or derogation of the beneficial interest. Stilwell v. Insurance Co., 72 N. Y. 385; Garner v. Insurance Co., 110 N. Y. 266, 18 N. E. 130; Whitehead v. Insurance Co., 102 N. Y. 143, 6 N. E. 267; United States Trust Co. v. Mutual Ben. Life Ins. Co., 115 N. Y. 152, 21 N. E. 1025; Walsh v. Insurance Co., 133 N. Y. 408, 31 N. E. 228. Although the paid-up policy apparently makes the insurance payable to Maria E. Negus or her children, it should be remembered that Maria E. Negus at that time was deceased. Why her name was continued as a beneficiary does not appear, but it was probably done by the company either as a matter of precaution or for the purpose of indicating that this policy was fundamentally based upon and the logical outgrowth of the original policy under the stipulation expressly providing for it in case of the nonpayment of premiums and a surrender of the origi-

nal. However that may be, the fact is undisputed that at the time the paid-up policy was issued the only beneficiaries under the original policy were the children of Maria E. Negus. They were then the only parties interested in the original policy; their rights were unqualified by any condition or contingency; and they, and they alone, were entitled to claim the benefit of the stipulation under which the company had bound itself to issue a paid-up policy. Instead of recognizing this, the company, in issuing the paid-up policy, extended its benefits to the children of the insured, with the further qualification that, if there should be no such children surviving, then it should be paid to the executors, administrators, or assigns of the insured. This was, of course, a very serious change in the terms of the insurance, prejudicial to the interests of his then children, and a radical departure from the original contract. The children of Maria E. Negus, as has been already said, were the parties with whom the contract was made. They were the ones entitled to enforce it; in other words, it was their property. As was said by Judge Finch in a similar case (Whitehead v. Insurance Co., 102 N. Y. 143, 6 N. E. 267):

"The contract is about the husband, but not with him. He, therefore, in procuring the policies to be made, in paying the premiums, in receiving and acting upon notices, and in doing whatever was necessary to perfect and continue the rights of the assured, must stand in the attitude of an agent, acting for and representing the assured (Baker v. Insurance Co., 43 N. Y. 283), and as having no interest in the·policies, unless, possibly, after the death of all of the assured. And it makes no difference that they have been kept in total ignorance of the existence of the policies for their benefit until after the death of the insured, for their claim to the fruits of the insurance must necessarily be a ratification of the acts by which it was obtained."

· There is no evidence in the case of any kind from which it can be legitimately inferred that the consent of these beneficiaries was obtained to this change which took place in the terms of the original policy. All of them who are now living have positively sworn that they had no knowledge whatsoever in respect to the matter; that they knew nothing about the surrender of the original policy, or in respect to the issuing of the paid-up policy, or what rights, if any, they may have had under either. Nor is there any evidence tending to show that their father had any greater power or authority as their agent in the matter than such as the law implies from the relation of the insured to the assured under this form of insurance. On the contrary, the evidence which has been given on behalf of the children of the first marriage tends to show that they never consented to the change; and in this respect, I think, the probabilities of the case support their contention. It is hardly likely that the attention of the insured was particularly drawn to the different provision that was made for the beneficial interest when the paid-up policy was issued. At that time he was still a widower, and, furthermore, the portion of the paid-up policy which provides for payment to others in case Maria E. Negus should not be living at the time of the death of the insured is a part of the printed form of the policy itself. This, coupled with the fact that it is made payable in the first instance to Maria E. Negus, who at

that time was dead, tends to give color to the claim that there was probably no actual intention, on his part at least, of making any change in the beneficial interests. However this may be, it is quite plain that there was no original consent to the change, and, unless a subsequent ratification can be shown, the fund representing the insurance must be awarded exclusively to the children of the first marriage now living and the representatives of such as are now deceased.

In order to establish a ratification, various acts and statements on the part of these children are relied upon. On or about December 30, 1883, William I. Negus, being desirous of securing for his own benefit whatever dividends might be declared upon the policy in question, and also on another policy held by him in the same company, obtained from William V. Negus, Maria L. Smith, Jane E. Carpenter, and Loretta Negus, four of the children of the first marriage, a written order, directed to the New York Life Insurance Company, which reads as follows: "Pay to William I. Negus whatever dividends may be hereafter declared on policies Nos. 95,661 and 110,817." This was filed with the company, and upon it whatever dividends were declared upon the paid-up policy were paid to the insured. The claim is that, as the paid-up policy in question was indicated in this order by its number, the giving of the order was an adoption of the act of the insured in surrendering the original policy and taking out the new one, and is as effectual as if a consent to such change had been originally given. At the time that this paper was signed, William V. Negus was under age. After he came of age, and on the 30th day of December, 1891, the following paper was signed by him: "The undersigned beneficiary under the paid-up policy of the New York Life Insurance Company No. 95,661, insuring the life of William I. Negus, hereby request and authorize the said company to pay the cash value of all dividends declared or that may hereafter be declared upon said policy to William I. Negus, and his receipt shall be a full release to the company for the same." This was signed by William V. Negus alone. He states that he did so at the request of his father, who told him that he had promised the company that he would obtain such a paper from him upon his coming of age, and that it was intended to confirm his signature to the former order. He states that his father assured him at the time that it would not affect his interest in the policy. Mrs. Loretta N. Carpenter testifies that she signed the order for the payment of dividends, and also obtained the signatures of her sisters thereto, at the request of her father, who stated that he wanted to raise some money, and that it would help him along; and both she and her brother, who are now the only surviving children of the first marriage, testify that at the time they had no knowledge whatsoever in respect to the old policy, or that there had been any surrender of it, or as to what rights, if any, they had in any insurance upon their father's life. Mrs. Negus, the widow, however, testifies that some time in that year, she thinks, she heard the deceased state to his daughters Jane E. Carpenter, now deceased, the defendant Loretta N. Car-

penter, and his son, the defendant William V. Negus, that he wished to speak to them about his policy of insurance, and that she thereupon withdrew to an adjoining room. Her testimony as to what took place is as follows:

"Well, as near as I remember, he stated that he wished to speak to them about his policy. I never made it a point to be present when he had conversations with his former children, or his children by his other wife, but 1 was in an adjoining room, and heard him say that he wanted them to sign their consent; and I heard distinctly his daughter Jennie, who is deceased, make the remark, when he asked her if she was willing to consent that the younger children participate, she said: 'Why, certainly, pa. Why not? They are your children the same as we are.'"

She also states that the deceased made the remark to his son William:

"The others have already signed, and the company have sent word that when you are of age that you are to sign."

She also states that she could not say positively whether Mrs. Smith, one of the other daughters, was there at the time or not, as it was not clear enough in her mind. She also states that her husband had the policies in his hands, although I hardly think that her testimony as a whole can, in this regard, be taken as meaning more than that he had some papers in his hands which she believed to be the policies. It is evident, upon reading the entire testimony of this witness upon this point, that her recollection was not strong as to what took place at the time. She either did not hear or was unable to recollect anything else that was said or done on the occasion. Nor is there anything in the papers in evidence which were signed by these parties that tends to corroborate this testimony. The inference which we are expected to draw from it is that the insured was endeavoring to secure the written consent of his children by the first marriage to the participation in the policy by the children of the second marriage, for Mrs. Negus testifies that at the same interview he made the remark to his son William, already referred to: "The others have already signed, and the company have sent word that when you are of age that you are to sign." The difficulty about this is that no paper of any kind or description signed by these parties, or by any of them, is shown to have existed at any time, except the two orders for the payment of the dividends that might be declared. Taking this into account with the denials of the two surviving children who are alleged to have been present at the interview in question that any such statements were made, I feel bound to conclude that Mrs. Negus is mistaken in her recollection. It is a fact that the order for the payment of the dividends was executed in that year, and that Mrs. Carpenter was requested by her father to sign the order, and also to procure the signatures of her sisters, and it is therefore quite possible that Mrs. Negus may have heard this conversation, and misunderstood its purport.

There was considerable evidence given as to conversations and actions of the defendant William V. Negus, after the death of his father, relative to the insurance, which is also relied upon for the purpose of showing a ratification, but it amounted to very little

more than statements by him that there was some doubt as to whether the children of the second marriage would participate; that he hoped it would be found that they were so entitled, and that he knew that would be in accordance with his father's wishes. But at the time that these conversations were going on the subject of the rights of these parties was undergoing examination, and it cannot be fairly inferred from anything that he said or did that he intended to waive any legal right that he might have; and I think it is plain from all the evidence that, as soon as all of the facts in regard to the original and the substituted policies were discovered, the children of Maria E. Negus asserted and stood upon their rights. The same reasoning applies also to the deductions which the counsel for the children of the second marriage seeks to draw from the filing of the proofs of loss. It is an essential element of ratification that the person against whom it is asserted should have been informed in respect to all of the facts upon which his rights rested, and, as it has also been held in some cases, it must likewise appear that he is informed of what his rights are as a matter of law. Adair v. Brimmer, 74 N. Y. 539–554; Ritch v. Smith, 82 N. Y. 627. The proofs utterly fail, I think, to show that there has been any such ratification in this case. Stress has been laid upon the reference contained in the orders for the payment of dividends to the number of the paid-up policy, as if that in some way enlightened those who signed the paper in respect to the contents of the policy and the transactions associated with its issue. This claim, however, is utterly untenable. All that can be reasonably inferred from the giving of these orders is that the parties intended that, so far as they were concerned, they were willing that dividends upon their father's insurance policies should be paid to him. There was nothing in either of them tending to show in any way or to suggest that the issue of the policy referred to had the effect of defeating or impairing any of their rights. I am therefore of the opinion that the fund belongs exclusively to the children of the first marriage and the legal representatives o such as are deceased, and that the children of the second marriage have no interest in it. The fund is really the outcome of the original insurance, and, although conserved by the paid-up policy, there is no difficulty in applying it in conformity with the terms of the original policy. Barry v. Brune, 71 N. Y. 261. Judgment is therefore awarded accordingly.

Ordered accordingly.